*Service Copy*

IN THE CIRCUIT COURT OF CAPE GIRARDEAU COUNTY
STATE OF MISSOURI

DEREK W. CORNELIUS, )
GARY HAYNES, and )
CREATIVE COMPOUNDS. LLC. ) Cause No. 09CG-CC00061
)
Plaintiffs, ) Division II, Judge Benjamin F. Lewis
)
v. ) JURY TRIAL DEMANDED
)
ADORNO & YOSS. LLP, a Florida limited )
liability partnership, and )
THOMAS L. PETERSON. )
)
Defendants. )

## FIRST AMENDED PETITION FOR DAMAGES

COME NOW Plaintiffs, by and through counsel, pursuant to Rule 55.33(a) and for their

First Amended Petition for Damages against Defendants, state as follows:

### THE PARTIES

1.      Plaintiff Derek W. Cornelius is. and was at all times relevant herein. a resident of

the State Missouri, residing in Cape Girardeau County.

2.      Plaintiff Gary Haynes is, and was at all times relevant herein. a resident of the

State Missouri. residing in Scott County.

3.      Plaintiff Creative Compounds. LLC ("Creative") is. and was at all times relevant

herein. a Nevada limited liability company with a principal place of business in Scott County.

Missouri and registered to do business in the State of Missouri.

4.      Upon information and belief, Defendant Adorno & Yoss, LLP ("Adorno") is, and

was at all times relevant herein, a Florida limited liability partnership with a principal place of

business in Miami, Florida.

- 1 -


FILED
AUG - 6 2009
CHARLES P. HUTSON
CIRCUIT CLERK

5.     Upon information and belief, Defendant Thomas L. Peterson is, and was at all times relevant herein, a resident of the State of Virginia and a partner at Adorno.

## JURISDICTION AND VENUE

6.     This Court has personal jurisdiction over the Defendants under RSMo. § 506.500 in that Defendants regularly conducted business with Plaintiffs in this State and committed tortious acts against Plaintiffs in this State which are alleged to and form the basis for this Petition.

7.     Venue is proper in this County under RSMo. § 506.290 in that Plaintiff Derek W. Cornelius ("Cornelius") resides in this County.

## FACTS COMMON TO ALL COUNTS

8.     Creative was founded in 2002 by Plaintiff Gary Haynes ("Haynes") as a bulk raw materials supplier for the sports nutrition, food, and dietary supplement industries.

9.     At all times relevant herein, Haynes was the CEO and managing member of Creative, and Cornelius was a paid consultant for Creative.

10.     Cornelius and Haynes regularly collaborated to research and develop novel compounds to be used in the sports nutrition, food, and dietary supplement industries and find novel uses for existing compounds.

### Adorno and Peterson

11.     Adorno is a large law firm headquartered in Miami, Florida, with offices located throughout the world.

12.     Adorno claims to have more than 270 attorneys and one of the 300 largest law firms in the United States, and holds itself out as having expertise in intellectual property matters. According to intellectual property page on its website, Adorno has "worked with

hundreds of clients and vendors focusing and refining [their] clients' business goals . . ." and has "gained a unique perspective" to "help our technology business clients assess risks and opportunities and reach effective solutions for clients' specific transactions."

13.     Peterson is a licensed patent attorney, and is admitted to the bar in the District of Columbia and to several federal courts including the United States Supreme Court.

14.     Peterson was a former patent examiner and has been licensed to practice before the United States Patent and Trademark Office in patent cases since at least 1986.

### Creative's Retention of Adorno and Peterson

15.     The sports nutrition, food, and dietary supplement industries are highly competitive, and success is in part, a function of developing and protecting new products. As such, intellectual property, particularly patents, were and remain key to Creative's success as an ongoing enterprise.

16.     Because it desired to protect its intellectual property interests, Creative engaged Peterson and Adorno no later than December 30, 2004 to represent it in an intellectual property litigation matter filed in New Jersey.

17.     At Peterson's request, on or about January 26, 2005 Creative paid a retainer of $5,000 to Adorno to represent it in intellectual property matters.

18.     On or about April 18, 2005 Creative received an Examiner's Answer from the U.S. Patent and Trademark Office on U.S. Patent Application S/N 10/249,683 by Haynes and Cornelius, entitled "Dicreatine Malate," which application was being prosecuted for Creative by a patent attorney other than Peterson.

19.     On or about June 29, 2005 Creative received an Office Action from the U.S. Patent and Trademark Office rejecting the claims of U.S. Patent Application S/N 10/408,797 by

Haynes and Cornelius, entitled "Metabolic Enhancing Properties of Octopamine Salts," ("the Octopamine Application") which application was being prosecuted for Creative by a patent attorney other than Peterson.

20.    On or around July 2005 Haynes, acting on behalf of himself, Cornelius, and Creative, asked Peterson to represent them in prosecuting new and pending patent applications.

21.    Haynes explained that there would be new applications on other inventions to be filed, which Cornelius would draft and send to Peterson, as the patent law expert, for his review, editing, and filing of the applications.

22.    Adorno, acting through Peterson, agreed to represent Haynes, Cornelius and Creative in prosecuting patent applications.

23.    As part of the representation, Peterson entered his appearance on the prosecution of U.S. Patent Application S/N 10/249,683 on behalf of Creative and the inventors, Haynes and Cornelius on August 9, 2005.

### Abandonment of the Octopamine Application

24.    As a patent attorney, Peterson knew that the deadline to respond to the Office Action on the Octopamine Application, including all possible extensions of time, was December 29, 2005.

25.    At least as early as September 16, 2005, Peterson drafted amended claims for the Octopamine Application and sent them to Haynes.

26.    On October 19, 2005 Haynes queried Peterson regarding the status of the Octopamine Application, but did not receive a response.

27.     Peterson never responded to the Office Action on the Octopamine Application which resulted in the abandonment of the application, causing Cornelius, Haynes and Creative to lose the opportunity obtain patent protection.

28.     Despite knowing that he had failed to respond to the Office Action on the Octopamine Application, thus causing the application to be abandoned, Peterson continued to represent to Plaintiffs that the Octopamine Application was still pending.

29.     Nearly a year later, on September 5, 2006, in response to an inquiry by Haynes as to the status of Creative's patent applications, Peterson sent a list of "Creative Compounds Patent Applications" and listed the Octopamine Application, knowing that the application had been abandoned due to Peterson and Adorno's inaction.

30.     On February 15, 2007 Haynes notified Peterson that a third-party was selling products with octopamine that would infringe the amended claims of the Octopamine Application and asked Peterson to draft and send a warning letter to that third-party.

31.     On or about February 19, 2007 Peterson sent out a letter that he drafted, advising the potentially infringing third-party, "The use of Octopamine in products, such as the Max products identified above, is the original invention of Creative Compounds and patent protection is being obtained for such use. The purpose of this letter is to formally put you and Max Muscle on notice that once the patent is received, Creative will aggressively enforce its patent rights against all infringers, including Max Muscle. Under the patent law, Creative will be able [to] obtain damages for patent infringement during the period of time that the application for a patent is pending. Thus, your use of Octopamine now in violation of Creative's patent rights will not go unpunished."

32.    Peterson sent this letter knowing that he had already allowed the Octopamine Application to go abandoned and that Creative no longer had any pending patent protection for octopamine.

33.    The Octopamine Application would have been patentable if the claims had been amended as drafted by Peterson.

## Peterson's Failure to File December 2005 Applications

34.    On July 8, 2005 Haynes, acting on behalf of himself, Cornelius, and Creative, engaged Peterson and Adorno to review, edit, and file a patent application drafted by Cornelius entitled "Arginine Malate Salts."

35.    On August 1, 2005 Haynes, acting on behalf of himself, Cornelius, and Creative, engaged Peterson and Adorno to review, edit, and file a patent application drafted by Cornelius entitled "Amines with Fat Loss and Appetite Suppressing Properties."

36.    On October 6, 2005 Haynes, acting on behalf of himself, Cornelius, and Creative, engaged Peterson and Adorno to review, edit, and file a patent application drafted by Cornelius entitled "7-beta Hydroxyl Steroid Derivative with Weight Loss and Muscle Preserving Properties."

37.    On October 19, 2005 Haynes, acting on behalf of himself, Cornelius, and Creative, engaged Peterson and Adorno to review, edit, and file a patent application drafted by Cornelius entitled "Arachidonic Acid as Effective, Oral Agent to Increase Hormones." ("the Arachidonic Acid Application").

38.    On October 31, 2005 Haynes, acting on behalf of himself, Cornelius, and Creative, engaged Peterson and Adorno to review, edit, and file a patent application drafted by Cornelius entitled "Metabolic Enhancing Properties of Phenethylamine and its Salts."

39.    Haynes informed Peterson that Creative was in a rush to get the patent applications described in paragraphs 34-38 herein (collectively "the December 2005 Applications") examined, and Peterson explained that Petitions to Make Special could be filed thereon to expedite the examination.

40.    On December 9, 2005 Peterson told Haynes that the December 2005 Applications were nearly ready to file, that he needed formal papers such as declarations and powers of attorney to be signed, and that he needed checks from Creative for the filing fees (made payable to the U.S. Patent and Trademark Office).

41.    On December 12, 2005 Peterson sent Haynes formal papers to be signed in relation to the December 2005 Applications, including Powers of Attorney from Haynes and Cornelius to Peterson. On the same day Haynes returned the formal papers and the filing fee checks to Peterson by overnight courier.

42.    All Peterson had to do to file the December 2005 Applications was to submit them electronically to the Patent and Trademark Office over the Internet or to deliver them by hand to the Patent and Trademark Office which was only miles away from Adorno's Washington, D.C. office.

43.    As a patent attorney, Peterson knew or should have known that patent applications must be filed within one year of an invention's first public use, sale, offer for sale, or published disclosure, or any patent rights are lost ("statutory bar").

44.    Peterson failed to file any of the December 2005 Applications.

45.    Despite this, on September 5, 2006, in response to an inquiry by Haynes as to the status of Creative's patent applications, Peterson sent a list of "Creative Compounds Patent

- 7 -

Applications" and listed each of the December 2005 Applications, knowing that the same was false.

46.    On November 14, 2006 Haynes was deposed in Cape Girardeau, Missouri by plaintiff in a lawsuit in which Creative was accused of infringing a patent on arachidonic acid, and Adorno, acting through Peterson, defended the deposition. During the deposition Haynes was asked about claims made by Creative that it had its own pending patent application related to arachidonic acid. Haynes responded that the Arachidonic Acid Application had been filed by Peterson. Haynes was further asked specifics about the Arachidonic Acid Application, including the exact scope of the patent application and when it was filed. Haynes responded that the application had been filed by Peterson, but that he did not recall the details.

47.    Peterson, knowing that he had never filed the Arachidonic Acid Application, failed to inform Haynes about the failure to file the application, and thus did not permit Haynes to correct the record later in the deposition.

48.    The December 2005 Applications would all have been patentable if Peterson had filed them, but were subject a statutory bar at the time Creative discovered the omission.

49.    Haynes, acting on behalf of himself, Cornelius, and Creative, asked Peterson to arrange for the filing of foreign patent applications in Europe, Canada, and Australia for each of the aforementioned patent applications, including the December 2005 Applications.

50.    As a patent attorney, Peterson knew that most other countries had more stringent novelty requirements than the U.S. for patent applications.

51.    Despite knowledge of the requisite timeliness of the foreign patent applications, Peterson failed to file any foreign patent applications.

52.    On October 13. 2006 Haynes queried Peterson about the status of the foreign patent applications and requested confirmation of the filings before an industry trade show took place.  Peterson. knowing that no foreign patent applications had been filed and that it was already too late to file the same. responded the same day that he would "have them [the confirmation] before show time." Peterson never sent the confirmations.

## Other Applications

53.    On February 7. 2006 Haynes, acting on behalf of himself. Cornelius. and Creative, engaged Peterson to review, edit, and file two patent applications drafted by Cornelius entitled "Procream for Weight Loss" and "Procream for Weight Gain."

54.    On September 6, 2006 Haynes, acting on behalf of himself. Cornelius. and Creative. engaged Peterson and Adorno to review, edit, and file a patent application  drafted by Cornelius entitled "Nutritional Uses for Palatinose, Trehalose and Xylose."

55.    On September 25, 2006 Haynes, acting on behalf of himself. Cornelius. and Creative, engaged Peterson and Adorno to review, edit, and file a patent application drafted by Cornelius entitled "Novel Carboxylic Salts of Caffeine."

56.    On October 12, 2006 Haynes, acting on behalf of himself, Cornelius. and Creative, engaged Peterson and Adorno to review, edit, and file a patent application drafted by Cornelius entitled "Physiological Uses of Thyroid Hormone Derivative."

57.    Peterson failed to file any of the patent applications identified in paragraphs 53-56 herein.

58.    The applications would all have been patentable if Peterson had filed them, but were subject a statutory bar at the time Creative discovered the omission.

- 9 -

## Discovery of the Malpractice

59.     During the course of Peterson's and Adorno's representation of Plaintiffs, Haynes periodically asked Peterson about the lack of bills and the status of Creative's original retainer. Peterson repeatedly assured Haynes that the bills were forthcoming and that he and Adorno would continue to represent Plaintiffs on the matters described above.

60.     On or around September 22, 2006 Peterson requested that Creative reimburse him personally (and not through Adorno) $500 for "out of pocket expenses." Peterson presented Haynes with evidence that a payment was made for the Dicreatine Malate patent application on Plaintiffs' behalf in the amount of $395, but did not provide evidence as to the source of the funds for the payment.

61.     On or around November 16, 2006, in response to further inquiries from Haynes about Adorno's billing, or lack thereof, Peterson requested an additional fee payment to Adorno for $15,000, but did not provide any invoices or statements detailing the reasons for the fees.

62.     Creative promptly sent Adorno a check for $15,000. This payment was accepted by Adorno.

63.     In early 2007 Haynes and Cornelius noticed a pattern of errors and omissions by Peterson in other cases that Peterson and Adorno were handling for Plaintiffs and for another company, which is owned by Cornelius, including but not limited to:

   a.   Failing to file lawsuits on behalf of Plaintiffs;

   b.   Failing to file counterclaims in lawsuits filed against Creative;

   c.   Failing to request reexamination on competitors' patents as directed by Plaintiffs;

   d.   Failing to raise and subsequently waiving jurisdictional defenses;

   e.   Failing to prosecute appeals of lawsuits;

f.  Permitting a default judgment against a company owned by Cornelius; and

g.  Failing to respond to discovery requests.

64.  As a result of this pattern of errors and omissions by Peterson, Plaintiffs grew concerned that Peterson and Adorno were not acting consistent with their obligations to Plaintiffs.

65.  On April 4, 2007 Haynes asked Peterson by e-mail to provide the serial numbers and copies of all the applications Plaintiffs had filed in the United States and elsewhere.

66.  On April 11, 2007, having not received a response to that inquiry, Haynes expressly reiterated his request for a list of patent application numbers. Haynes repeated this request on April 13, 2007.

67.  Having not received any responses to the repeated inquiries and having become suspicious of whether Peterson and Adorno had done the promised patent work, Haynes and Cornelius met with Peterson at the Washington, DC office of Adorno on April 20, 2007.

68.  Haynes and Cornelius were astonished to find that the "Washington office of Adorno & Yoss" was a single office staffed by Peterson without any other attorneys, staff, or even a receptionist.

69.  Despite knowing ahead of time that Haynes and Cornelius were flying all the way to Washington on that day for the meeting, upon their arrival Peterson informed them that he had no information for them because he purportedly left Creative's files at his residence that day and did not provide Haynes and Cornelius with any documentation.

70.  On or about April 25, 2007 Cornelius called Peterson and confronted him regarding the patent work that was not done. In that conversation, Peterson admitted none of the patent work had been done.

71.    On April 27, 2007 Haynes, acting on behalf of himself, Cornelius, and Creative, demanded that Peterson and Adorno cease all work for Plaintiff unless expressly requested otherwise.

## COUNT I – Legal Malpractice

72.    Plaintiffs reallege and incorporate by reference herein the allegations contained in Paragraphs 1 through 71 of the First Amended Petition as if fully set forth herein.

73.    At all relevant times hereto, an attorney-client relationship existed between Plaintiffs and Defendants.

74.    Peterson and Adorno acted negligently in their allowing the abandonment of the Octopamine Application and in their failure to file the patent applications presented to them for filing.

75.    As attorneys for Plaintiffs, Defendants owed them a duty to use that degree of skill and learning ordinarily used under the same or similar circumstances by similarly employed attorneys in the legal profession.

76.    Defendants specifically owed to Plaintiffs a duty to use that degree of skill and learning ordinarily used under the same or similar circumstances by attorneys specializing in patents and/or intellectual property.

77.    Defendants failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by similarly employed attorneys in the legal profession by allowing the abandonment of the Octopamine Application, by failing to file the December 2005 Applications, the foreign patent applications, and the various other patent applications presented by Plaintiffs to Defendants for filing as more specifically set forth in Paragraphs 1 to 71.

78.    But for Defendants' negligence, Plaintiffs would have successfully prosecuted the patents at issue and obtained protection for their intellectual property.

79.    As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered damages.

80.    Defendants' conduct was outrageous becaue of its evil motive or reckless indifference to the rights of Plaintiffs.

WHEREFORE, Plaintiffs pray that this Court grant judgment against Defendants for compensation for Plaintiffs' damages in a sum that is fair and reasonable in excess of Seventy-Five Thousand Dollars ($75,000), for an award of punitive damages, costs, attorneys' fees, pre- and post-judgment interest, and for such further and other relief that the Court deems just and proper.

### COUNT II – Breach of Fiduciary Duty

81.    Plaintiffs reallege and incorporate by reference herein the allegations contained in Paragraphs 1 through 80 of the First Amended Petition.

82.    At all relevant times hereto, an attorney-client relationship existed between Plaintiffs and Defendants.

83.    As Plaintiffs' counsel, Defendants owed fiduciary duties to Plaintiffs which included, among other things, care for Plaintiffs' intellectual property entrusted to Defendants.

84.    Defendants' breached these fiduciary duties and, as a direct and proximate result of that breach, Plaintiffs have suffered damages.

85.    Defendants' conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiffs.

WHEREFORE. Plaintiffs pray that this Court grant judgment against Defendants for compensation for Plaintiffs' damages in a sum that is fair and reasonable in excess of Seventy-Five Thousand Dollars ($75,000), for an award of punitive damages, costs, attorneys' fees, pre- and post-judgment interest, and for such further and other relief that the Court deems just and proper.

## COUNT III – Fraud

86.     Plaintiffs reallege and incorporate by reference herein the allegations contained in Paragraphs 1 through 85 of the First Amended Petition.

87.     Defendants made numerous false, material representations to Plaintiffs that they had already taken the necessary steps to preserve Plaintiffs' intellectual property by making certain filings with the U.S. Patent and Trademark Office.  These false representations inludes, among others, Defendants' transmissions of "Creative Compounds Patent Applications" on September 5, 2006, Peterson's statements of October 13, 2006 regarding the foreign patent applications, Peterson's statements of November 14, 2006 made during the deposition of Haynes, and Defendants' transmission of the February 19, 2007 letter regarding potentially infringing conduct.

88.     The representations were false in that Defendants had not already made the necessary filings to preserve Plaintiffs' intellectual property.

89.     Defendants made these representations to Plaintiffs with knowledge of their falsity or with reckless disregard for the truth of the representations.

90.     Defendants intended that Plaintiffs rely on these representations and not seek other attorneys to make the necessary filings to preserve Plaintiffs' intellectual property.

91.     The representations were material to Plaintiffs' selection of legal counsel and to the actions they took to protect their intellectual property.

92.     Plaintiffs relied on Defendants' numerous representations and did not seek other attorneys to protect their intellectual property, and such reliance was reasonable under the circumstances.

93.     Plaintiffs relied on the representations in not seeking other attorneys to protect their intellectual property, and such reliance was reasonable under the circumstances.

94.     Plaintiffs were not aware that Defendants' statements were false and Plaintiffs had a right to rely on Defendants' statements.

95.     The representations were material to Plaintiffs' selection of legal counsel and to the actions they took to protect their intellectual property.

96.     As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered damages. Such damages include, but are not limited to, Plaintiffs' inability to protect their intellectual property, lost profits, and other consequential damages.

WHEREFORE, Plaintiffs pray that this Court grant judgment against Defendants for compensation for Plaintiffs' damages in a sum that is fair and reasonable in excess of Seventy-Five Thousand Dollars ($75,000), for an award of punitive damages, costs, attorneys' fees, pre- and post-judgment interest, and for such further and other relief that the Court deems just and proper.

Respectfully submitted,

By: _____

Matthew A. Rosenberg, #45670
LAW OFFICES OF MATTHEW ROSENBERG, LLC
36 Four Seasons Ctr., #116
St. Louis, MO 63017
(314) 256-9699
(314) 786-0532 Fax

Steven M. Sherman, #47842
Alan H. Norman, #38555
David B. Jinkins, #49254
THOMPSON COBURN, LLP
One US Bank Plaza
St. Louis, MO 63101
(314) 552-6000
(314) 552-7000 Fax

*Attorneys for Plaintiffs*

- 16 -